**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3263-17T3

IMSUK LEE, individually, and
in her capacity as General
Administratrix and as Administratrix
Ad Prosequendum of the Estate of
Susie Choi, deceased, and SEONG
GIL CHOI,

     Plaintiffs-Appellants,

v.

LA QUINTA HOLDINGS, INC.,
and LA QUINTA INN & SUITES,

     Defendants-Respondents,

and

BLOOMFIELD COLLEGE,

     Defendant.

_____

Submitted January 23, 2019 – Decided February 11, 2019

Before Judges Suter and Firko.

On appeal from Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-2909-16.

Kim & Bae, PC, attorneys for appellants (Paul I. Perkins and Leigh Smith, on the briefs).

Traub, Lieberman, Straus & Shrewsberry, LLP, attorneys for respondents (Matthew Toto, on the brief).

PER CURIAM

In February 2015, twenty-three-year-old Susie Choi (decedent) tragically passed away after drowning in defendant's pool. In this appeal, plaintiff Imsuk Lee, the Administratrix Ad Prosequendum of her daughter Susie's estate,[1] appeals from a Law Division order granting summary judgment dismissal of the complaint she filed against defendant La Quinta Inn & Suites.[2] Having considered the parties' arguments in light of the record and applicable legal standards, we affirm.

I.

We derive the following facts from the summary judgment record, viewed in the "light most favorable to plaintiff[], the non-movant[] . . . ." Schiavo v. Marina Dist. Dev. Co., 442 N.J. Super 346, 366 (App. Div. 2015) (citing

---

[1] Regrettably, decedent's father, plaintiff Seong Gil Choi, passed away after the lawsuit was filed.

[2] Plaintiff does not appeal the order granting summary judgment dismissal of the complaint as to Bloomfield College. Decedent was an exchange student housed at the hotel. All references to defendant refer to La Quinta Holdings, Inc. and La Quinta Inn & Suites.

Robinson v. Vivirito, 217 N.J. 199, 203 (2014)).  On February 11, 2015, at approximately 5:05 p.m., decedent was found at the bottom of defendant's indoor pool by two hotel guests.  Efforts undertaken to resuscitate her at the scene were unsuccessful, and she was transported to St. Mary's Hospital in Passaic.  Upon arrival, she was evaluated and treated, but never regained consciousness.  She passed away two days later at the hospital.  The only medical record provided by plaintiff is a progress note that states, "Rescue [and] brought here hypothermic.  Probable vasovagal syncope[3] while in pool [two degrees] to EtOH[4]/hot tub.  Became hypothermic (while in pool) with multiorg[an] failure."  The death certificate stated the cause of death was

---

[3] Vasovagal syncope is defined as "the common faint," which is "often triggered by a combination of dehydration and upright posture. But it can also have an emotional trigger such as seeing blood . . . ."  Health Library, Syncope (Fainting), John Hopkins Medicine, (Feb. 1, 2019, 3:06 p.m.), https://www.hopkinsmedicine.org/healthlibrary/conditions/cardiovascular_diseases/syncope_fainting_22,Syncope(Fainting).

[4] EtOH is the shortened medical abbreviation for "ethyl alcohol."  Stedman's Medical Dictionary 675 (28th ed. 2006).  Further the second degree of intoxication is somewhere between .03 and .12 blood alcohol level.  This stage will present symptoms of "[d]imunition of attention, judgment and control[,] [b]egin[n]ing of sensory-motor impairment[,] [l]oss in finer performance tests."  Alcohol and the Human Body, Intoximeters (Jan. 31, 2019, 8:15 a.m.), https://www.intox.com/physiology/.

"[a]noxic encephalopathy complicating drowning."[5]  The family chose not to have an autopsy performed due to religious reasons.

Plaintiff alleges that defendant was negligent in failing to comply with various aquatic safety standards.  Following discovery, defendant filed for summary judgment, arguing plaintiff failed to produce evidence in support of her claims.  After oral argument, the motion judge granted defendant's motion and set forth his reasons on the record.  The judge concluded that defendant did not violate any aquatic standards relative to pool safety and that plaintiff's expert, Dr. Thomas Griffiths, rendered net opinions.

On appeal, plaintiff argues that the judge erred in granting summary judgment because there exist genuine issues of material fact as to whether defendant acted negligently, by finding that Dr. Griffiths rendered net opinions, by denying a res ipsa loquitur finding, and by placing undue weight on an autopsy not having been performed.

---

[5]  Anoxia is defined as: "Absence or almost complete absence of oxygen from inspired gases, arterial blood, or tissues." Stedman's Medical Dictionary 98 (28th ed. 2006).  Encephalopathy is defined as: "Any disorder of the brain." Stedman's Medical Dictionary 637 (28th ed. 2006).   Anoxic encephalopathy "occurs when there is a complete lack of blood flow to the brain."  Jennifer E. Fugate, et al., Anoxic-Ischemic Encephalopathy, Oxford Medicine Online (Jan. 31, 2019, 9:35 a.m.), http://oxfordmedicine.com/view/10.1093/med/9780190244927.001.0001/med-9780190244927-chapter-5.

A-3263-17T3

II.

We review a ruling on summary judgment de novo, applying the same standard governing the trial court. Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405 (2014). Thus, we consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational [fact-finder] to resolve the alleged disputed issue in favor of the non-moving party." Id. at 406 (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). "If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We review issues of law de novo and accord no deference to the trial judge's conclusions on issues of law. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

"To sustain a cause of action for negligence, a plaintiff must establish four elements: '(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages.'" Townsend v. Pierre, 221 N.J. 36, 51 (2015) (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 585 (2008)). "It is generally plaintiff's burden to prove not only that defendant was negligent, but also that defendant's negligence

A-3263-17T3

was a proximate cause of the injuries and damages suffered." O'Brien (Newark) Cogeneration, Inc. v. Automatic Sprinkler Corp. of Am., 361 N.J. Super. 264, 274 (App. Div. 2003) (citing Paxton v. Misiuk, 34 N.J. 453, 463 (1961)).

We address plaintiff's argument that the judge erred in finding Griffiths's reports constituted net opinions. Rule 702 permits expert testimony "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.J.R.E. 702. An expert opinion may be based on "an opinion or inference . . . perceived by or made known to the expert at or before the hearing." N.J.R.E. 703. Rule 703

> mandates that [an] expert opinion be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts."
>
> [Townsend, 221 N.J. at 53 (quoting Polzo, 196 N.J. at 583).]

The net opinion rule is a "corollary of [Rule] 703 . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Id. at 53-54 (quoting Polzo, 196 N.J. at 583). An expert must provide the "'why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Borough of Saddle River v. 66 E. Allendale,

LLC, 216 N.J. 115, 144 (2013) (quoting Pomerantz Paper v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). A net opinion, "unsupported by factual evidence, is inadmissible." Buckelew v. Grossbard, 87 N.J. 512, 524 (1981).

While noting that Griffiths was "one of the more foremost experts in this area," the judge found that the expert's conclusions did not "bring any genuine issue of material fact that the standard of care that's applicable to pool safety . . . was violated by the conditions that existed at [defendant's hotel] at the time of [decedent's] drowning." Griffiths opined that additional "layers of protection" "must" be implemented to prevent aquatic emergencies. Defendant, he claims, "could have" and "should have" included "layers of protection," such as: 1) educating, warning, and enforcing the ban on solo swimming; 2) providing "[a]ggressive and effective signage using warning shapes, warning colors, and warning symbols"; 3) renovating the swimming pool so that it does not exceed five feet in depth; 4) employing a pool attendant, who does not need to be a certified lifeguard, to remain on the pool deck in case of an emergency to perform rescues and resuscitations; 5) adding and extending surveillance cameras; and 6) "[m]aintain[ing] a buoyant life-line on the surface of the swimming pool at the breakpoint (five feet) with an accompanying black strip

painted on the pool bottom under the life-line." The judge found that defendant did not violate any standards of care. We agree.

An expert testifying "in negligence cases must establish the actual standard of care, and may not simply declare their personal preferences or the conduct they wish to encourage as being the standard." C.W. v. Cooper Health Sys., 388 N.J. Super. 42, 64 (App. Div. 2006) (citing Fernandez v. Baruch, 52 N.J. 127, 131 (1968)). In his addendum, Griffiths admits that "no New Jersey required administrative codes were violated by [defendant] in the drowning incident of [decedent]." He further acknowledges that this State's swimming pool code does not require buoyant life-lines or warning stripes at the bottom of a pool.

Griffiths asserted that although New Jersey codes do not require a buoyant float line, "the standard of care in aquatics indicates reasonably prudent pool operators should utilize one." He further opined, "[j]ust because New Jersey does not require these swimming pool safety devices, does not mean they are not necessary . . . ." Griffiths also erroneously claims "that [S]tate health codes written for swimming pool safety focus on water quality rather than water safety," and "lead to the preventable drowning death of [decedent]." His reports fail to provide the why's and wherefore's to support his opinion that defendant's

alleged negligence proximately caused the accident, or how his recommendations would have prevented this tragedy. Griffiths's opinion that defendant <u>should</u> have implemented certain safety regulations is insufficient to be considered that of an expert.

"[T]he admission or exclusion of expert testimony is committed to the sound discretion of the trial court." <u>Townsend</u>, 221 N.J. at 52. An opinion is inadmissible if an expert "cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is 'personal.'" <u>Davis</u>, 219 N.J. at 410 (quoting <u>Pomerantz</u>, 207 N.J. at 372). Griffiths cites to the American National Standard for public swimming pools, which provides:

> the transitional point of the pool . . . to the shallow area and from the shallow area to the deep area shall be visibly set apart with a rope and float line, depth marks, and a four inch minimum width row of floor tile, painted line, or similar means of color contrasting with the bottom.

Industry customs, however, "are not conclusive on the issue of the proper standard of care; they are at most evidential of this standard." <u>Id.</u> at 411 (quoting <u>Wellenheider v. Rader</u>, 49 N.J. 1, 7 (1967)). Defendant was in compliance with all of the safety regulations imposed by this State.

N.J.S.A. 26:4A-5 states that "a specially exempt facility shall be exempt from mandatory compliance with first aid personnel and lifeguard requirements

of N.J.A.C. 8:26-5[.2][6] . . . ." A "specially exempt facility" includes "hotel[s] . . . that restrict[s] the use of its pool to renters of the lodging units . . . their invited guests, or day-use visitors . . . ." N.J.A.C. 8:26-1.3. Griffiths acknowledged that defendant is a "specially exempt facility" and was not required to hire a lifeguard. Yet, he insisted that the hotel should "place a pool attendant on the pool deck[,]" to perform housekeeping duties when swimmers are not in the pool. This is merely his personal opinion.

Moreover, Griffiths claimed that defendant should "educate, warn, and enforce" its ban on solo swimming. N.J.S.A. 26:4A-6(a) requires exempt facilities, which voluntarily do not hire a lifeguard, to post a sign "not less than three feet by four feet," which states: "No lifeguard on duty. Persons under the age of [sixteen] must be accompanied by an adult. No swimming alone." Ibid. Hotel signs must also include: "[t]his pool . . . shall be closed when the owner or manager is not on the premises." Ibid. This sign must be displayed at each entrance of the swimming area, at the registration desk, and in each room used for occupancy by hotel guests. Ibid. Griffiths asserts that these signs should

---

[6] N.J.A.C. 8:26-5.2 requires "[a]t least one person currently certified in standard first aid and professional level infant, child, and adult cardiopulmonary resuscitation (CPR) . . . shall be on the premises, available, and readily accessible when the swimming pool is in use."

A-3263-17T3

include "warning shapes, warning colors, and warning symbols." Defendant had multiple signs posted with the required language, in the required places, in compliance with N.J.S.A. 26:4A-6(a). The statute does not require specific shapes, or coloring and does not require specially exempt facilities to enforce it.

As indicated in plaintiff's answers to interrogatories, decedent could read, write, and understand the English language. Griffiths contends that hotel guests do not read long lists on signs and that an average person will spend three to five seconds reading a sign. He argues that signs must use warning shapes, colors, and symbols to be "truly effective." Again, these are his personal opinions.

Finally, Griffiths's suggestion that defendant should have filled the pool no higher than five feet, and failed to install surveillance cameras to cover the entire swimming pool area, are not required by New Jersey law or code. Griffiths indicated that newly constructed swimming pools are built with a maximum depth of five feet in order to reduce drowning, while older pools were traditionally built with diving boards, requiring deeper waters. Because defendant's pool did not have a diving board at the time of the accident, he opined that the defendant should have only filled the pool up to five feet. He further claims that since the pool was not visible from inside the hotel, there

11

should have been surveillance cameras to monitor the entire swimming pool area. He acknowledged that surveillance is not required by Federal or State law or code.

We conclude that plaintiff's argument lacks merit. She failed to carry her burden to produce evidence of facts to support her expert's opinions and the judge properly found Dr. Griffiths rendered net opinions.

III.

Next we address plaintiff's argument that the judge failed to apply the doctrine of res ipsa loquitur. A defendant's negligence may be proven through the doctrine of res ipsa loquitur when: "(a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect." Buckalew, 87 N.J. at 525 (quoting Bornstein v. Metro. Bottling Co., 26 N.J. 251, 269 (1958)). The burden of proof is on the plaintiff to establish an inference of negligence.

> [T]he existence of a possibility of a defendant's responsibility for a plaintiffs' injuries is insufficient to impose liability. In the absence of direct evidence, it is incumbent on the plaintiff to prove not only the existence of such possible responsibility, but the existence of such circumstances as would justify the

12

inference . . . and would <u>exclude</u> the idea that it was due to a cause with which the defendant was unconnected.

[<u>Szalonotai v. Yazbo's Sports Café</u>, 183 N.J. 386, 399 (2005) (quoting <u>Hansen v. Eagle-Picker Lead Co.</u>, 8 N.J. 133, 141 (1951)).]

Plaintiff is unable to prove defendant was negligent, and conceded that it "compl[ied] with the bare minimum required by law." Unfortunately, there is no explanation as to the circumstances culminating in decedent's drowning and demise, only conjecture. Thus, the judge properly determined that plaintiff could not invoke the res ipsa loquitur doctrine.

IV.

In her final argument, plaintiff claims that the judge erred by considering the fact that an autopsy was not performed because there was a "consensus" among the medical professionals that the cause of death was drowning. We disagree. Plaintiff argues that an autopsy would have been inconclusive because of "therapy induced" changes resulting from decedent's hospitalization. In further support of her contention, plaintiff claims that the death certificate, police report, and the Passaic County Sheriff's Office Crime Scene Investigation Report prove the cause of death was drowning.

The death certificate, signed by Dr. Eddy Lilavois, stated the cause of death was, "anoxic encephalopathy complicating drowning[,]" and not simply

drowning. The medical record states that decedent "probably" suffered "vasovagal syncope." These opinions lack foundation and reasonable medical probability. See Johnesee v. Stop & Shop Cos., 174 N.J. Super. 426, 431 (App. Div. 1980) (requiring medical expert testimony to be stated "in terms of reasonable medical certainty or probability" and not mere "possibility.")

We also reject plaintiff's argument that her expert, Dr. Scott LaPoint, opined that decedent "did not sustain any trauma that would have caused loss of consciousness . . . [and there were] no intoxicating substances that would have contributed to the drowning . . . ." satisfies her evidentiary burden. The police report states that a doctor "believed" decedent became disoriented while in the hot tub, fainted, and fell into the pool. Dr. LaPoint's conclusions are based upon pure speculation and are not grounded in fact.

In light of the applicable standards, we find no error in the court's decision granting summary judgment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3263-17T3